GEORGE, In re. See Case No. 14,169.

## Case No. 5,327.

### The GEORGE.

[2 Gall. 249.] [1]

Circuit Court, D. Massachusetts. Oct. Term, 1814.[2]

PRIZE—COLLUSIVE CAPTURE — DELIVERY ON BAIL
—FURTHER PROOF.

1. A case of collusive capture. Regularly no delivery on bail of prize property ought to be made, either to the captors or the claimant, until, after a hearing of the cause. In most cases a sale is preferable to an appraisement, when the value is to be ascertained for the purpose of a delivery on bail.

[See The Bothnea, Case No. 1,686.]

---

[1] [Reported by John Gallison, Esq.]
[2] [Affirmed in 2 Wheat. (15 U. S.) 278.]

2. Under what circumstances further proof is admissible in cases of an asserted collusive capture. Further proof in prize causes is never admitted by way of oral testimony; but always by written evidence and depositions.
See The Bothnea [Case No. 1,686], and The Betsy [Id. 1,364].

In admiralty. This was a prize cause brought by appeal from the district court of Maine.

Dexter & Kinsman, for captors.
G. Blake and Mr. Preble, for the United States.

STORY, Circuit Justice. The schooner George, of the burthen of one hundred and thirteen tons, with her cargo, was captured, on or about the 13th day of January, 1814, by the private armed schooner Fly, of Portland, owned by Henry L. Dekoven, master, and William S. Sebor, lieutenant of the same vessel. The privateer is described in her commission as of the tonnage of thirty-nine tons and twenty-eight ninety-fifths, mounting four swivels and one carriage gun, and navigated by twenty men. In point of fact, there were only fifteen persons composing the crew, including the master and lieutenant, and prize master, who were the only officers on board; and the whole crew were hired on wages, and were to have no share whatsoever of prizes. At the time of the capture, the George was lying at anchor in Long Island harbor, in the island of Grand Manan, a British possession in Passamaquoddy Bay, ostensibly bound to Havanna, in the island of Cuba. The cargo on board, with the exception of thirteen hogsheads of fish, and three hundred boxes of herrings, consisted entirely of British manufactures of great value, and ostensibly owned by British subjects resident in the British dominions. The George was in fact navigated by five persons, according to the allegation in her certificate of clearance and list of men, viz. by a master, a mate, two seamen and a cook, and the three last were of different nations, one a Portuguese, one a Greek, and one a Spaniard. There was also on board a supercargo. Immediately upon the capture, which was made without the slightest resistance, the whole crew, except the master, were sent on shore, and the prize was brought into the port of Ellsworth, where she was seized by the collector. It seems, that the cargo of the George was originally brought from Halifax to St. Johns, and that from the latter place the vessel sailed, on or about the 8th day of January, 1814, having on board convoy instructions to rendezvous at Etang harbor, whence she was to sail on her voyage. It is worthy, however, of remark, as it connects itself with the last deposition of O. Thomas, that the place of rendezvous in the original convoy instructions is written "Halifax," which is erased, and "Etang Harbor" substituted. It is also worthy of remark, that the same privateer, but a few days before, cap-

tured a valuable vessel bound ostensibly from St. Andrews to Halifax. A prize allegation was filed in the district court of Maine by the master of the Fly, and upon the return of the usual monition, the United States intervened, and claimed condemnation of the George and cargo, upon the ground, that the capture was collusive, and a fraud upon the laws of the United States. Upon this claim the district court admitted the parties to further proof, and that having come in, after a full hearing, the vessel and cargo were condemned to the United States. From this decree the captors have appealed to this court, and the cause has here been elaborately argued.

Before I proceed to the consideration of the principal questions in this case, I shall take occasion to examine some collateral points, to which our attention has been directed, and which, with a view of settling the practice in prize causes, are very proper for judicial deliberation. And it is a source of painful consideration, that notwithstanding the many instances, in which this court has had occasion to express its disapprobation of the indiscriminate delivery of prize property on bail, contrary to the regular course of prize courts, to whomsoever shall choose to make himself a claimant, however weak, or fraudulent, or illegal, his title may be, that practice still continues. In the present case, after the United States had seized the property, and interposed a claim, on the ground of fraud, and before a hearing of that claim, a delivery on bail of the whole prize property was allowed to the captors after an appraisement. It is notorious, that such appraisements, when made with good faith, are extremely unsatisfactory; and in many instances it is equally notorious, that in appraisements the grossest impositions have been practiced upon the court. Why, in all cases of prize property, a sale, instead of a delivery on bail, should not be made, pending the prize proceedings, where the goods are really destined for sale in this country, it is not easy to answer. It would at least have this good effect, that it would at once suppress fraudulent claims by taking away the temptation to iniquitous practices, and it would repel from the public tribunals much of that reproach, which has been undeservedly cast upon them. In making these remarks, I wish to be understood, as not meaning to convey the slightest imputation upon the venerable judge of the district court of Maine. The evils are not attributable to himself; but to those irregularities of practice, as well in respect to delivery on bail, as other incidental proceedings, which have so much embarrassed the appellate court in revising the decisions from the district of Maine. The principal point, however, which has called for the attention of the court, is the practice, which is to govern in this novel proceeding on the part of the United States. There can be no doubt, that the United States

may well intervene in prize causes to secure and enforce their rights, whether growing out of the breach of municipal regulations, or of the laws of war. In the present case, such an intervention was peculiarly fit, for without doubt the property either belonged to the enemy, or to American citizens, who in this transaction must be deemed enemies. The question then occurs, whether the United States or the captors are entitled to introduce further proof, to sustain their relative rights, after all questions as to the character of the property itself have been settled. As to the United States, if they choose to rest their claim upon the facts apparent upon the record growing out of the prize proceedings, there is no reason in general for the admission of further proof. But if the fraud of the captors, or of the captured, is to be made out by evidence aliunde, it seems to me not only competent, but the indispensable duty of the court, to direct such further proof, and to issue commissions for this purpose. And where such further proof is admissible, it should in general be open to both parties, and always be by depositions and written evidence. Mere oral testimony is inadmissible in prize proceedings. There are exceptions, however, to the admission of further proof on behalf of the asserted captors; for if they have acted with gross ill faith, or gross negligence, the attendant of fraud, the court ought not to trust those with an order for further proof, who have thus shown that they mean to abuse it. This rule will be a salutary check upon captors, and will materially subserve the public interests, by suppressing fraudulent connivances, destructive of public morals. The admission of the further proof in the district court of Maine was, therefore, regular and proper; although it is to be regretted, that it was not taken by commission under an order distinctly allowed for this purpose.

. Let us now proceed to the merits of the controversy as between the United States and the captors, for there is no claim on behalf of the captured. And here, at the very threshhold of the cause, the court are called upon by the counsel for the captors, with an eloquence, to which it is impossible to yield too high a homage, to disentangle themselves from all prejudices and suspicions, and to believe the whole transaction a fair one, until it is proved otherwise by plenary evidence of fraud. We are emphatically reminded of the danger of trusting to appearances, as the guide of judgment, and. of the extreme indiscretion of hazarding conjectures, which mislead the more as ingenuity or confidence of mind induce us to indulge them. For myself, I receive the admonition with real pleasure, and have no inclination to undervalue its real force. For persons of exalted genius and authoritative learning, it may not be unfit to adopt the boldest pursuits on the ocean of conjecture. I pretend not to the rashness, or the ambition, to hold

so perilous a course. My humbler mind is content with humbler views, with judgments formed by patient inquiries, aided by the lights of authority and precedent. I content myself with plying the shore, as a more suitable task for those, who hope, by cautious diligence, to arrive at a port of safety. .To drop figurative language, I may be permitted to say, that the duties of a judicial office require a constant and patient examination of evidence, which is not only sometimes irreconcilable, but often comes under circumstances, which make the task unwelcome and embarrassing. To allow ourselves to be carried away by slight suspicions, or doubts, would be to surrender our judgments, and to inflict upon suitors all the punishments attending upon the popular delusion, as to the uncertainty of the law. But, when we are called upon to weigh probabilities, to detect impositions, and unweave the web which fraud and ingenuity, in this age of contrivance, industriously spread to ensnare and to deceive us, it would be the most extravagant of errors, to shut our eyes against what is passing in the world, and would betray a visionary attachment to ideal virtue, wholly inconsistent with the sad lessons, which experience daily points out and verifies by example. A course of this nature would be a complete sacrifice of judicial functions, and, under the mockery of law, would surrender the rights of all honest men in the community. If indeed the doctrine which I now assert, need support, it will be found recognized by Sir W. Scott in The Rosalie and Betty, 2 C. Rob. Adm. 343. "In considering this case," says that able judge, "I am told that I am to set off without any prejudice against the parties from any thing, that may have appeared in former cases; that I am not to consider former circumstances, but to suppose every case a true one till the fraud is actually apparent. This is undoubtedly the duty, in a general sense, of all who are in a judicial situation; but, at the same time, they are not to shut their eyes to what is generally passing in the world; to that obvious system of covering the property of the enemy, which, as the war advances, grows notoriously more artificial; higher prices are given for this secret and dishonorable service, and greater frauds become necessary; old modes are exploded, as fast as they are found ineffectual, and new expedients are devised to protect the unsound parts better from the view of the court. Not to know these facts, as matters of frequent and not unfamiliar occurrence, would be not to know the general nature of the subject, upon which the court is to decide; not to consider them at all would not be to do justice."

On a general survey of the case now before the court, it cannot but be conceded, that it bears a considerable resemblance to that class of cases of collusive captures, which, though not new, are yet very unwelcome guests to the court. The proximity of the

district of Maine to the British territories, the numerous ports with which it is indented, and the consequent facility of communication, afford the strongest temptations to illicit traffic, whenever the prices of British manufactures are so high in the United States as to excite the cupidity of speculating and unprincipled men. The extravagant prices of British manufactures since the war have quickened this avaricious spirit, and the records of this and of the district courts pronounce how extensive have been the combinations of the enemy and of some of our own citizens, to encourage and to protect this illegitimate commerce. Circumstances of this nature, though they may not justly awaken suspicions, are not likely to lull those, which have once been fairly excited. Taken in connexion with these circumstances, the case before the court may be considered in two views, viz. upon the intrinsic evidence, and upon the positive testimony, of collusion, which it presents. I will, in the first place, advert to that view, which is apparent upon the transaction taken per se. And here it cannot be denied, that some of the circumstances, relied on by the United States, afford a very slight, if any, inference of fraud. In truth, they are just such, as might accompany an innocent transaction, though they might not be strangers to a premeditated imposition. It is hardly possible, in this age of refinement in fraud, that any transaction should wear that character upon its forehead. It would be unnatural and absurd, that every disguise should be thrown off, and an invitation given to the public to sift and detect the purposed mischief. No men in their senses, however bold or thoughtless, would fail to throw over their dishonorable projects, the grace and ease and simplicity of truth. On the other hand, a care, sedulously exercised, to repel every possible imputation of illegality, would give too artificial and studied an effect, to escape public notice. The systematic arrangement would betray its origin.

Apart, then, from these general circumstances, let us consider the conduct of the privateer and of the prize. In the first place, the armament, size and ownership, of the privateer, considering the advanced state of the war, and the diligence and force of the British navy on our coast, were not of such a nature as decisively to engage the assent of the mind in favor of the apparent intention of the parties. But connected with the extraordinary mode of hiring the crew, it is difficult to resist the impression, that something more was meant, than the ordinary employment of a cruise. This is the first instance, which has ever come before me, in which seamen have been hired on board of a privateer at monthly wages, and with an express release of all claims to the prizes captured during the cruise. The impolicy of such a stipulation is so obvious, that it seems hardly credible, that in any bona fide transaction it should find a place. It has a direct and immediate tendency to discourage all gallantry and enterprise, to sever the interests of the crew from that of the owners, and to afford temptations to plunderage and embezzlement of prizes. Men will not readily be induced to hazard their lives, where neither honor nor interest is at stake; much less will they guard with anxiety and vigilance, or defend with bravery and firmness, property, in which they have no hope of profit. I will venture to appeal to the knowledge of my learned brother in the district court, and of every gentleman of the bar, when I assert, that in the great number of prizes, which have been adjudicated in our courts since the war, not a solitary case can be found, where such a very extraordinary stipulation has existed. On the other hand, it is notorious, that high bounties, besides a full share of prize money, have been very frequently given, to induce seamen to engage in the service. So difficult has it been to secure adequate crews under all the allurements, which the enemy's commerce has afforded. And what is the inducement held forth in the present shipping articles for a release by the crew of their shares in prizes? The wages of twenty dollars per month, which the shipping articles denominate extraordinary wages. Now I will venture to appeal to the experience of all persons conversant with this business, that bounties as high as this have often been given or advanced; and that, as wages, the sum does not much, if at all, exceed the ordinary rate of hire, which has been given since the war for private services. There is but one way of solving the difficulty, which such a stipulation presents; and that is, that the voyage was intended for fraudulent purposes, and the captures were to be collusive. The service was contemplated to be short, and the wages were to be easily earned by a traffic without honor and without peril.

The conduct and equipment of the captured vessel were not less singular. She was loaded with a very valuable cargo of merchandise, all of which, with the exception of an insignificant quantity of fish and herring, which might have been thrown in by way of cover, was peculiarly fitted for the market of the United States. I will not say, that the cargo was not adapted for the Havanna market. In general, it probably was, for it is inconceivable that the parties, if they intended a fraud, should forget to make the destination at least plausible. It is sufficient for my purpose, that all the British manufactures were of a sort, which bore the highest price, and were most in demand in the United States. On the other hand, the cargo, however well adapted for sale in the Havanna, could not there, from the freedom of intercourse and the facility of trade, bear prices at all proportionate. And it is not a little extraordinary, that an

indirect trade through the British provinces should, with the accumulation of double freights and expenses, be carried on, when the direct trade from Great Britain was open to the enterprises of her merchants. The crew of the George were also wholly inadequate for such a voyage in the winter season. Two seamen and a cook, who were foreigners, composed the crew for ordinary duty; and it is inconceivable that so valuable a cargo should have been intrusted with so small a crew for any thing more, than a mere coasting voyage. And why should foreigners be selected? It is said that British seamen were scarce and liable to be impressed. But, however true this may be in the mother country, no one can doubt, that the provinces afford large numbers of seamen. The other equipments of the vessel for the voyage I do not think it necessary minutely to consider; though I must confess, that the testimony strongly impresses me with the belief, that they were not sufficient for the ostensible voyage. The vessel also had convoy instructions, and orders to rendezvous, as it is affirmed, at Etang harbor, so as to sail under the protection of convoy. Putting out of sight all question whether Halifax was not the real station for convoy, which I incline to believe, why was not the George at Etang harbor, conformably to her orders? She sailed, as it is apparent from her logbook and from the testimony in the case, with a wind fair for that port, and yet, so far from placing herself under the protection of convoy there, she voluntarily sought an open harbor in an exposed island, incapable of defence against any hostile attack, and obvious to every hostile cruiser. This extraordinary conduct is not attempted to be accounted for, and is indeed incapable of any rational explanation. It was certainly the height of madness, if the property and destination were bona fide; and I cannot but think, that there was too much method in this madness, to warrant a supposition of innocent delusion. And for what purpose was the George lying in Long Island harbor for several days? Nothing appears to justify it. The circumstances also of the capture are not a little singular. The privateer, it seems, had due notice of its destined prey while lying in an American port, and immediately sailed to obtain it, without even the benefit of an accurate pilot. The George was captured without the slightest resistance, while lying at anchor; and immediately her whole crew, except the captain, were sent on shore, and the prize manned for an American port. Now I would ask, why should the supercargo and the crew have been dismissed, to give the alarm, and increase the chance of a recapture. Why, so near an American port, should the captors have voluntarily relinquished the statutable bounty for every prisoner of war? Why should not the supercargo have been brought in, to answer on the standing interrogatories? Without pretending to answer these questions, I must say, that if the capture were collusive, there would be nothing extraordinary in these occurrences. As to the papers found on board, there is nothing in them, which is decisive either way. Nothing is more easy, than the fabrication of papers; and these are as merely formal, as any that could be devised. It is notorious upon the records of our courts, that as illicit trade has become more inviting, places have changed their names; Halifax has become St. Bartholomews; and I know not why, in a given case, by a like metamorphosis, Havanna may not have become a port in the district of Maine. These are some of the intrinsic circumstances of this transaction, which carry to my mind a pregnant presumption of collusion. They may, perhaps, have occurred in a bona fide voyage; but so rare would be the chance, and so extraordinary the coincidence, that the most sober judgment would pause, before it would incline to admit the probability.

If we turn to the positive testimony in the case, every doubt of innocence must be strengthened, and every presumption of guilt inflamed. Much of the apparent difficulty in weighing the testimony will be avoided by taking all the depositions in a chronological order, and comparing the successive depositions of the same persons together. It is said, that the testimony of some of the witnesses, as to the confessions of the Messrs. Merrits, is incredible. I profess not to feel the force of this objection. I can perceive no reason, why persons engaged in smuggling, in the tide of success, and under circumstances of almost thoroughly imagined security, from past experience, as well as present hopes, should not, among persons of their own vocation, recount their success, or avow their intentions, with all the self-complacency of regular adventurers. So far as the testimony is impeached by credible witnesses, it undoubtedly abates its force; but after every reasonable deduction on this head, I am still of opinion, that the weight is in favor of its verity. But setting all the rest aside, the testimony of James Crocker, who stands wholly unimpeached and has no interest; would be decisive as to the collusion. It is difficult to read his statements, and not to yield to the conclusion, that the capture was collusive. On the whole, I am for affirming the decree of the district court. As this opinion is concurred in by the district judge, let the decree be affirmed.

Upon an appeal to the supreme court, further proof was directed [1 Wheat. (14 U. S.) 408], and upon its coming in, the court, after full argument, affirmed the decree (2 Wheat. [15 U. S.] 278).